A. F. POLLMAN, Executor of the Estate of MARY SCHAPER, Appellant, v. JOHN H. SCHAPER et al.

### Division One, June 2, 1914.

CONVEYANCES: Fraud: Dower: Evidence. The evidence in a suit by a. widow to set aside conveyances of lands and avoid gifts of personalty by her husband *held* to show no concealment or fraud and that the disposition of the property was made by way of advancements to children, with her consent and participation, and not in anticipation of death or to defeat dower.

Appeal from Lincoln Circuit Court.—*Hon. James D. Barnett*, Judge.

AFFIRMED.

*Taylor R. Young, Willard H. Guest* and *Avery, Young & Woolfolk* for appellant.

(1) The deeds executed by appellant's testate were voidable as to her. Moore v. Moore, 67 Mo. 198. (2) The life estate of appellant's testate, which turned out to be a phantom (Pollman v. Schaper, 158 Mo. App. 615), not being given in lieu of dower, is no bar to same, and if it had been the consideration has failed. Dudley v. Davenport, 85 Mo. 463; Pollman v. Schaper, 158 Mo. App. 615. (3) The question of estoppel cannot arise in this case. All the facts alleged as grounds for estoppel transpired at a time when the widow's right was inchoate. Rockwell v. Rockwell, 81 Mich. 493; Appeal of Welso, 102 Pa. St. 7; Creary v. Lewis, 114

Mo. 582; Martien v. Norris, 91 Mo. 465.   (4) The disposition of property by a husband in anticipation of death with a view of depriving his wife of her marital rights, no matter what causes impel the act, is fraudu-' lent as to such widow; and the belief of immediate dissolution is not necessary if the act can be said to be a testamentary act.   Stone v. Stone, 18 Mo. 392; Tucker v. Tucker, 32 Mo. 464; Tucker v. Tucker, 29 Mo. 350; Dyer v. Smith, 62 Mo. App. 606; Brandon v. Dawson, 51 Mo. App. 237; Stratt v. O'Neil, 84 Mo. 68; Rice v. Waddill, 168 Mo. 118.   These rights were not waived in view of the testimony here.   "Waiver is where one in possession of any right, whether con- 'ferred by law or by contract, and with full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right and of his or her intention to rely upon it."   Bishop on Contracts, secs. 792, 799. ˙ Even if this were not so, appellant's testate did not waive her right under the authorities.   The rule is laid down in 10 Am. & Eng. Ency. Law, p. 211, sec. 16:   "In the absence of some statute changing the common law the wife cannot be barred of her dower by an agreement entered into after marriage; and if she does agree to accept a pro- vision in lieu of dower she may, after the death of her husband, elect· to repudiate the agreement and claim her dower."   Dudley v. Davenport, 85 Mo. 463.

*Charles Martin* and *Jesse H. Schaper* for respond- ents.

(1)   The presumption that the deeds signed and acknowledged by Mrs. Schaper were intended and un- derstood by her is not overcome by the evidence in the case.   Engine & Thresher Co. v. Donovan, 147 Mo. 622; Biggers v. Building Co., 9 Mo. 210; Comings v. Leedy, 114 Mo. 477; Riecke v. Westenhoff, 10 Mo. App. 358; Morrison v. McKee, 11 Mo. 594.   (*a*)   The

presumption was in favor of the defendants that the deeds were honestly made, and not for the purpose of defrauding the plaintiff. (b) However, this question need not rest upon the foregoing presumptions, for the evidence greatly preponderates in favor of the conclusions reached by the trial court—not only upon this branch of the case, but also upon every issue made in the case. Even if the evidence were more evenly balanced, this court adopts the custom, in the decision of this class of cases, to defer to the trial court in its findings of fact because of the advantages possessed by the latter tribunal in observing the manner and demeanor of the witnesses. Mathias v. O'Neil, 94 Mo. 520; Parker v. Roberts, 116 Mo. 667; Loan Co. v. Brown, 177 Mo. 412. (2) To invalidate the disposition of personal property made by the husband in his lifetime, as in fraud of dower rights of the wife, the disposition should be shown to be testamentary in character, and to have been made with the purpose of defrauding her of her dower. Crecelius v. Horst, 89 Mo. 356; Brandon v. Dawson, 51 Mo. App. 237.

BLAIR, C.—This is an appeal from a judgment in a suit begun by Mary Schaper, widow of William Schaper, to set aside certain conveyances of land and avoid certain gifts of personalty on the ground that they were made by her husband with the intent to dispose of the property for the purpose of defeating her rights as his widow in case she survived him.

Conveyances: Fraud.

William and Mary Schaper were married in 1870, each having been married before and each having five children by the previous marriage. Of their marriage two children were born.

Defendants are the children of William Schaper by his first marriage and those born of the union between William and Mary.

Since the appeal was taken Mary Schaper died and A. F. Pollman, her executor, and her son by her first marriage, appears as appellant.

In 1890 William Schaper was seventy years of age and owned four tracts of land, aggregating 910 acres, and was possessed of $12,000, or more, in cash. On June 16, 1890, he and his wife, the original plaintiff, conveyed the four tracts of land mentioned to Charles, Jesse, William and Frank Schaper, the latter being a son of the grantors and the three others being sons of William Schaper by his former marriage.

The tract conveyed to Frank Schaper contained 440 acres and constituted the home place; and the grantors, William and Mary Schaper, by the deed, retained a life estate therein. The other three tracts were of less extent and value and were conveyed outright. The deed to Frank Schaper was not delivered until some three years after its execution. After its delivery William and Mary Schaper lived with the son Frank on the home place until William Schaper died, in September, 1905, at the age of eighty-five years and four months.

During the period between June 16, 1890, and the death of William Schaper, in 1905, he gave various sums of money to the various children, some to each of them, but comparatively little to Mary Schaper's children by her first marriage. These gifts of money aggregated about $12,000, and the last of them was made about 1899 or 1900.

After the delivery of the deed to Frank Schaper in 1893 or 1894, William Schaper, with his wife's knowledge and consent, entered into an agreement with Frank whereby the latter was to operate the home place of 440 acres, in which William and Mary owned a life estate and Frank owned the remainder, and was to care for and support William and Mary in consideration of the use of the farm as long as they or either of them lived. This agreement was faithfully carried

out by Frank during the joint lives of the father and mother, and, after the death of William, his father, Frank continued to carry out the agreement with the mother, caring for and supporting her until she, admittedly without complaint or ground for complaint against Frank or his treatment of or care for her, went to St. Louis to live with A. F. Pollman, her son by her first marriage and now her executor. Soon thereafter a series of suits was begun, of which this seems to be the third.

Appellant contends the evidence shows that William Schaper in 1890 feared he was about to die and executed the conveyances mentioned for the purpose of defrauding his wife, Mary, of her dower, and procured her to execute them by imposing upon her through her ignorance of English and lack of understanding of the effect of the instrument she was signing, and makes a like contention as to the gifts of money made to the defendants.

So far as concerns the contention that William Schaper in June, 1890, anticipated his own early death, the strong preponderance of the evidence is, simply, that he had reached the age of seventy, began to realize that his powers were beginning to fail and that he was growing old and, in the general course of nature, could not expect to live many years. An effort was made to show that he had once or twice had the La Grippe and once had been frightened by a severe storm and rendered nervous thereby, but it does not appear that these things or any other had brought him to the belief in 1890 that he was then under the shadow of impending death.

The weight of the evidence is that Mary Schaper had discussed with her husband the matter of distributing some of his property among his children so that he might be relieved of the burden of caring for it. There is a strong tendency in the testimony to prove that she originated the idea and urged it upon

her husband.    There is ample evidence that she knew
she was signing the instruments which would vest the
ownership of the farms in the four sons.    She, herself,
testifies that she knew that by the papers she signed
Frank was to get the place described in his deed and
Henry and Charles were to get those described in the
deeds to them, but couldn't tell whether she knew
about the effect of the conveyance to William.    She
said she knew the sons took possession and claimed
to own the farms and William and Henry sold theirs.
She also admitted, in substance, that she knew the deed
to Frank was not delivered for three or four years after
June 16, 1890, because William Schaper, the husband,
desired first to see whether Frank was a good farmer.
It is true she testified through an interpreter and that
she said she didn't know what a deed was or what a
will was and that she signed the papers at Mr. Schaper's
request without knowing what they were; but she
thought they might have been read over to her, though
she didn't know about that.    She also said she didn't
know she was relinquishing her rights.

On the other hand, some of the children testified
that the matter was talked of in the family in Mrs.
Schaper's presence and that she referred on such occa-
sions to the fact of the deeds having been made; and
one witness, not related to either party, testified that
he overheard Mrs. Schaper upbraiding her husband
because he had not delivered the deed to Frank when
the deeds to the other sons were delivered.    There
is no doubt that Mrs. Schaper was cognizant of the
gifts of money made to the several children, and she
herself testifies she was satisfied with them. .

Her testimony shows she may not have known,
technically, what a deed or will was or whether she
was signing a deed or will, but it does show she knew
the effect of her signing would be that the grantees
would get the lands described in the several instru-
ments.    Her testimony is somewhat contradictory but

a careful examination of it indicates that while she could not define the terms deed and will and consequently could not say which she signed, she had been acquainted with the effect of the instrument she signed before she affixed her signature. We think this explains most of the apparent contradiction in her testimony.

If, however, her testimony is to be literally understood, she flatly contradicts herself as to her knowledge of the contents of the instruments she signed. Whichever view the trial court took of her testimony, the other evidence in the case fully warranted his finding that Mary Schaper knew of William Schaper's intent to rid himself of some of the burdens of looking after his property by distributing it among his children; that she probably suggested and urged this course upon him and, in any event, acquiesced in and agreed to it; that the distribution was talked over in the family and referred to by her and other members of the family in her presence many times after it was made; that she knew of the gifts of money, took part in them, exhibited pleasure that they were made, and testified she was satisfied with what her husband did with respect to them.

She and her husband retained a life estate in the home place of 440 acres, and after his death this life estate became wholly hers.

This case is unlike those cited in appellant's brief and relied upon for reversal. The preponderance of the evidence justified the trial court in finding that there was no concealment or secrecy or fraud in the transactions; that Mary Schaper knew, or consented to, joined in and, probably, originated the plan which was carried out; that she was well advised of the effect of her participation therein and that the disposition of the property was made by way of advancements to the children, not in anticipation of death or to defeat dower but to relieve an aged couple of the burdens

of managing a considerable estate and reserve ample provision for their own support and maintenance, so that they might spend their declining years in peace and ease, unburdened by the annoyances of administering numerous properties they did not need for use. That this was the result of the arrangement is the effect of Mary Schaper's testimony and no other view of its purpose was taken until she went to St. Louis and fell under the direct influence of the present appellant. The judgment of the trial court was right and is affirmed. *Brown, C.*, concurs.

PER CURIAM.—The foregoing opinion of BLAIR, C., is adopted as the opinion of the court. All the judges concur.